IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID E. SIERRA-LOPEZ,

                    Plaintiff,                                    OPINION AND ORDER

      v.
                                                                  22-cv-502-wmc
BROOK STEINGRAEBER,

                    Defendant.

---

Plaintiff David E. Sierra-Lopez represents himself and is incarcerated by the Wisconsin Department of Corrections ("DOC"). He was granted leave to proceed with an Eighth Amendment claim that defendant Brook Steingraeber failed to protect him from self-harm on September 3, 2021. (Dkt. #7.) Plaintiff further filed a motion for summary judgment, arguing defendant Steingraeber failed to respond reasonably after he reported having thoughts of cutting himself. (Dkt. #38.) In response, defendant filed a cross-motion for summary judgment, arguing there is no evidence that plaintiff suffered an actionable injury on September 3, nor that she disregarded a significant likelihood plaintiff would harm himself, and regardless, that she is entitled to qualified immunity. (Dkt. #44.) After considering all of the pleadings and exhibits in the record, defendant's motion for summary judgment will be granted and plaintiff's motion will be denied for the reasons explained below.

UNDISPUTED FACTS[1]

**A. Steingraeber's Involvement on September 3, 2021**

Plaintiff Sierra-Lopez is presently in custody at the Columbia Correctional Institution ("CCI"), where defendant Steingraeber has worked as a correctional officer since 2019.  In September 2021, Steingraeber was a "utility officer," meaning that she worked different posts from day to day, as opposed to being assigned to a specific unit.  On September 3, 2021, Steingraeber was working first shift (6:00 a.m. to 2:00 p.m.) on Restrictive Housing Unit 2 ("RH2"), where Sierra-Lopez was housed in cell number 07.  At approximately 6:30 a.m., while Steingraeber was passing out medications (commonly referred to as a "medication pass"), she spoke to Sierra-Lopez about an issue with his ibuprofen being missing from the medication cart and his frustration with the Health Services Unit ("HSU").  Officer Steingraeber then told Sierra-Lopez that she would contact the HSU to see if she could figure out what was going on with his medication.  (Ex. 1005 at 01:20 – 07:02.)

During this same conversation, Sierra-Lopez showed Steingraeber an unfolded paperclip that he had been given.  Steingraeber asked Sierra-Lopez to give her the paperclip

---

[1] Unless otherwise indicated, the facts set forth in this section are taken primarily from defendant's proposed findings of fact (dkt. #45), plaintiff's response to those findings of fact (dkt. #61), and several video recordings of the parties' encounter on September 3, 2021. (Defendant's Exs. 1004-1010 (dkt. #48-2 through dkt. #48-8).)  To the extent that many of plaintiff's proposed findings of fact in response are argumentative, conclusory, or cite to no evidence, those findings are not considered.  *See* W.D. Wis. Proc. to be Followed on Mot. For Summ. Judg., § II(C), (E); *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2011) (courts are to consider only evidence set forth in proposed finding of fact with proper citation).

twice, but Sierra-Lopez declined each time.  She then asked him if he would be okay for now, and he told her that he would, so Steingraeber continued with the morning medication pass.  (*Id*. at 7:40 – 08:17.)  Shortly thereafter, Steingraeber was called to respond to a self-harm incident by a different, nearby inmate.  (*Id*. at 19:38 – 20:12.)

At 6:45 a.m., Steingraeber completed the medication pass without further contact with Sierra-Lopez.  (Ex. 1006.)  At 7:15 a.m., Steingraeber next checked on Sierra-Lopez while she was distributing breakfast trays and asked how he was doing.  (Ex. 1007 at 06:54 – 07:30.)  Sierra-Lopez did not express that he was having any thoughts of self-harm during that encounter either.  (*Id*. at 10:27 – 10:56.)

Steingraeber spoke to Sierra-Lopez again at 7:50 a.m., while she was picking up breakfast trays.  (Ex. 1008 at 00:00 – 02:25.)  At this time, Sierra-Lopez again showed her the paperclip.  (*Id*.)  Steingraeber immediately asked him for it, but he said, "Not right now."  (*Id*.)  At that time, Steingraeber specifically asked Sierra-Lopez to let her know if he started feeling like he wanted to harm himself.  (*Id*.)  Steingraeber also informed Sierra-Lopez that she had not yet contacted the HSU about his ibuprofen but would talk to the supervisory officer (Sergeant Price) about it.  (*Id*.)  Although Sierra-Lopez expressed frustration with his situation, he also told her he would wait and expressed no thoughts about or plans to harm himself.  (*Id*.)

At some point later that same morning, Officer Steingraeber noticed that Sierra-Lopez had covered his window.  Because that is not allowed, she reported it to Sergeant Price.  Sierra-Lopez specifically alleges that this occurred while Steingraeber was conducting the security count on his tier at around 11:15 a.m., after which Sierra-Lopez

represents he announced in a "loud and clear" voice that he was "having thoughts of cutting himself." (Sierra-Lopez Decl. (dkt. #41) ¶ 43.) When no one came to check on him after his announcement, Sierra-Lopez then took a "large and sharp piece of hard solid plastic" from a broken container and began cutting his left arm. (*Id.*) With his cell window still covered, Sierra-Lopez stated again to Steingraeber as she passed by his cell while taking another inmate to the shower at 11:20 a.m., that he was having thoughts about cutting himself. (*Id.* at ¶ 44.) After she allegedly ignored him, Sierra-Lopez reports cutting his left arm several more times with the piece of plastic.[2] (*Id.* at ¶¶ 44, 46.)

Steingraeber took over as the officer in the sergeant's station at 12:55 p.m. on September 3, 2021, and she stayed there until her shift ended at 2:00 p.m. Officer Steingraeber reports having *no* further contact with Sierra-Lopez that day. At no time that day does Steingraeber recall Sierra-Lopez *ever* expressing that he was having thoughts of self-harm. She notes further that Sierra-Lopez had opportunities to report any thoughts

---

[2] There is no video available to document this encounter and plaintiff accuses defendant of spoliation for failing to preserve it. (Dkt. #39, at 16-17.) Defendant provides a sworn declaration from DOC Corrections Program Supervisor Wayne Stolpa, who explains that: the available video was retained because of defendant's involvement in a documented, self-harm incident involving another inmate on the morning of September 3, 2021; but no further footage exists because no request was received from plaintiff to preserve defendant's body-worn camera footage within the time allowed under DOC's retention schedule. (Stolpa Decl. (dkt. #53) ¶¶ 17-25.) While unfortunate, a sanction for spoliation of evidence is appropriate *only* where there is a showing of bad faith, such as destruction of evidence to hide adverse information. *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013). Here, plaintiff does not assert that video was destroyed in bad faith, nor does there appear any basis to infer it. Moreover, for reasons discussed below, the available record is adequate to refute plaintiff's claim that he sustained a serious injury on September 3, 2021, or that defendant was deliberately indifferent to a risk of serious harm. As a result, plaintiff fails to show that he was prejudiced by any failure to preserve additional video footage from September 3, 2021, much less that sanctions are warranted.

of self-harm to several other staff members present during first shift on September 3; and a nurse from the HSU was also on the unit at 11:08 a.m. for another medication pass.

In addition, Officer Steingraeber points out that there is *no* record of any kind documenting an incident of self-harm involving Sierra-Lopez that day, and emphasized that had there been, she would have immediately reported it to Sergeant Price since it was not safe for her to enter his cell and intervene due to the risk of staff assault. (Steingraeber Decl. (dkt. #48) ¶¶ 38-39, 43-44.)  In particular, Steingraeber explains that when an inmate shows a correctional officer that they have a paperclip or other object that they could use to harm themselves, the first step is to ask the inmate to hand out the object.  If the inmate refuses to hand out the object, an officer is to ensure that the inmate is safe to be left in their cell and go report the incident to the sergeant assigned to her unit.  If the inmate reports that they are not safe for the officer to leave their cell-front to report the incident, she would instead have used her radio to contact the sergeant, and stayed at the inmate's cell until a supervisor arrived.  It is then the *sergeant's* responsibility to take any next steps in ensuring the inmate's safety, which usually involves the sergeant going to the inmate's cell-front to try and gain compliance by asking the inmate to hand out the object. If the sergeant cannot gain compliance, efforts to retrieve the object then escalate to summoning a security supervisor (a lieutenant or captain), who would also attempt to have the inmate surrender the object.  If the inmate still refuses to hand out the object, the security supervisor has the discretion to put together a team and use force in the form of OC spray, taser, and/or a physical cell extraction to gain the inmate's compliance.

In this case, although Sierra-Lopez showed Officer Steingraeber that he had a paperclip and refused to give it to her during the morning medication pass or the later, breakfast tray collection, there is no dispute that Sierra-Lopez assured Steingraeber that he was safe and did not express any thoughts or plan to self-harm. Indeed he denied having such thoughts or plans during those encounters. (*See* Ex. 1005 at 6:30 – 8:17; Ex. 1008 at 0:00 – 2:25; see also Dkt. #60, at 4 (acknowledging that plaintiff "used ins coping skills and did not make any self-harming or suicidal statements to defendant at the a.m. med pass").)

Sierra-Lopez, who has a history of mental illness, nevertheless claims that Steingraeber failed to protect him from self-harm by leaving his cell-front while he was supposedly having a "schizophrenic episode." Sierra-Lopez also represents that many inmates at CCI will hold onto and conceal items that they can use to self-harm due to mental health issues. For her part, Steingraeber acknowledges this, but explains in her experience, that an inmate holding an item that *could* be used for self-harm is not necessarily an indicator that the inmate *will* actually use the item to self-harm, especially in restrictive housing, and the small number who do hold onto this type of contraband ever actually harm themselves.

Finally, for safety purposes, officers are not allowed to enter an inmate's cell alone.[3] As such, Steingraeber could not have gone into Sierra-Lopez's cell alone in an attempt to

---

[3] Records indicate that Sierra-Lopez in particular has an extensive record of conduct reports, featuring numerous violations for engaging in sexual misconduct, including masturbating in front of female officers while propping open the cell's tray door. (Steingraeber Decl. (dkt. #48) ¶ 41; Dkt. #48-9, at 1-10.)

get the paperclip.  While Steingraeber *could* have attempted to gain compliance from Sierra-Lopez by using OC spray without waiting for a supervisor, according to Steingraeber, since Sierra-Lopez did not express any active thoughts of self-harm nor was he actively self-harming, she believed that using OC spray on him at that point would not have been an appropriate use of force.

### B.  Sierra-Lopez's Medical Treatment

As for Sierra-Lopez's alleged injuries, he claims to have cut his left forearm and wrist multiple times over the course of several hours, starting at around 11:15 a.m. on September 3, 2021, and that his wounds soon started to itch and smell bad, indicating infection. Moreover, when a DOC inmate has a medical concern and wishes to communicate with medical staff, or requests to be seen by HSU staff, he may fill out a Health Service Request ("HSR") form and submit it to the HSU.  Once an HSR is triaged by nursing staff, it is placed in the inmate's personal request folder portion of his individual medical record. Nevertheless, when Health Services Manager Alana Acker searched Sierra-Lopez's patient request folder for September 2021, she found no HSRs indicating that Sierra-Lopez cut himself on September 3 or needed treatment.  Nor does Sierra-Lopez assert that he sought medical care for any injuries he allegedly sustained on September 3, 2021.

While Sierra-Lopez was treated for a small, self-inflicted laceration on his left wrist a week later on September 11, 2021, the record also shows that Nurse Clinician Concepta Teresa Amimo cleansed that minor wound with an antimicrobial cleanser and closed it with steri-strips.  She then applied an antibiotic ointment and bandage.  Amimo further represents that, if Sierra-Lopez had cut himself multiple times on September 3 and did not

7

seek treatment for cuts that were allegedly infected, the wounds would *still* have been visible on September 11.  However, when she treated Sierra-Lopez for a single laceration on that day, she did not observe any other wounds.  In contrast, Sierra-Lopez explains that he cleaned his wounds with soap and water on September 3, and that they had healed with only "permanently disfiguring [scars]" by September 11.

## C.  Sierra-Lopez's Psychological Treatment

Apart from medical care, inmates at CCI can request psychological care by submitting a Psychological Services Request ("PSR") to the Psychological Services Unit ("PSU").  If they need to see PSU staff immediately, inmates are also advised that they need to alert unit staff of their problem or concern.  From there, PSU staff respond by triaging the mental health needs of an inmate when urgent concerns are brought forward by unit staff.  If an inmate is deemed by a PSU staff member to be a threat to his own safety or the safety of others, he may be moved to the RHU and placed in clinical observation status.[4]

In September 2021, Sierra-Lopez had a mental health diagnosis of antisocial personality disorder, but he does not have a diagnosis of schizophrenia.[5]  (Dkt. #51-1.) Rather, Dr. Kelsey Strange, who is the Psychologist Supervisor at the CCI PSU, reviewed Sierra-Lopez's records and found multiple occasions (between June and December 2021)

---

[4] Clinical observation status, in which security staff check on the inmate every 15 minutes and note their observations in a log, is a non-punitive status used for the temporary confinement of a patient to ensure their safety or the safety of others.

[5] Sierra-Lopez disputes this, again claiming that he was diagnosed with schizophrenia at the Brown County Jail, but he presents no evidence in support of this claim.

in which he contacted PSU for psychological care, often expressing thoughts of self-harm or stating that he was suicidal.  However, Dr. Strange also found no indication that Sierra-Lopez sent a PSR, or otherwise informed PSU staff, that he wished to receive care on September 3, 2021, or had harmed himself on that date.  Instead, in Dr. Strange's opinion, Sierra-Lopez repeatedly utilized maladaptive coping skills to get his needs met during this time period, knowing that staff would intervene and using these interactions in an attempt to address unrelated concerns and desires.  (Strange Decl. (dkt. #51) ¶¶ 22-25.)

## OPINION

In this suit under 42 U.S.C. § 1983, plaintiff claims that defendant failed to protect him in violation of the Eighth Amendment by disregarding his thoughts of self-harm on September 3, 2021.  Plaintiff moves for summary judgment on his claim by arguing that the evidence establishes defendant's deliberate indifference to a risk to his safety. Defendant cross-moves, asserting that there is no evidence that plaintiff sustained an actionable injury, nor that she was deliberately indifferent to a serious risk that plaintiff would imminently harm himself.  In either case, therefore, defendant argues that plaintiff's claim fails on the merits.  Alternatively, she asserts entitlement to qualified immunity.

## I.     Summary Judgment Standard Involving *Pro Se* Litigant

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The fact that the parties filed cross motions for summary judgment does not

alter this standard.  Rather, in evaluating each party's summary judgment motion, the court must "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (citation omitted).  The party opposing the motion must then "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted).

Moreover, in doing so, "[t]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party."  *Id.* (citing *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087-88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

And while *pro se* litigants are entitled to liberal construction of their pleadings, they, too, have the burden to come forward in response to a motion for summary judgment with evidence that demonstrates a genuine issue of material fact.  *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) ("[A plaintiff's] *pro se* status doesn't alleviate his burden on summary judgment.") (citation omitted).  Further, while the court views the record "in the

light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere "speculation or conjecture." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

Finally, a court need not adopt a party's version of the facts when it is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In particular, because there are video recordings of several of the defendant's interactions with plaintiff on September 3, 2021, which are unchallenged by plaintiff, the court is entitled to view the facts about those interactions in "the light depicted by the videotape." *Jones v. Anderson*, 116 F.4th 669, 677 (7th Cir. 2024) (citation omitted).

## II.    Eighth Amendment Claim

Here, plaintiff claims that the defendant is liable for violating his rights under the Eighth Amendment, which prohibits "cruel and unusual punishments" caused by deliberate indifference to conditions resulting in the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although the Constitution does not mandate comfortable prisons, officials have a duty under the Eighth Amendment to provide "humane conditions of confinement" by ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Officials must further "take reasonable measures to guarantee the safety of the inmates" in their custody. *Id*. When an Eighth Amendment claim is premised upon a failure to prevent

11

harm, a plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm" and that prison officials were deliberately indifferent to that risk. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (citing *Farmer*, 511 U.S. at 834).

Deliberate indifference depends on the defendant's subjective state of mind. *McDaniel v. Syed*, 115 F.4th 805, 832 (7th Cir. 2024). To demonstrate deliberate indifference, therefore, a prisoner must show that the defendant "'*actually* knew of and disregarded a substantial risk of harm.'" *Id*. (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (emphasis in original). In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Also, if he takes reasonable steps to abate that risk, an official is not liable for deliberate indifference to a known risk. *Id*. at 844-45. This is so even if the harm is not necessarily averted. *Id*.

For these reasons, proof of deliberate indifference is a "'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cnty*., 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc*., 982 F.3d 451, 458 (7th Cir. 2020)). "Negligence or even objective recklessness -- the 'fail[ure] to act in the face of an unjustifiably high risk that is so obvious that it *should* be known' -- is not enough to satisfy this standard." *McDaniel*, 115 F.4th at 832 (quoting *Petties*, 836 F.3d at 728 (emphasis in original). Instead, evidence of "callous disregard" for inmate wellbeing is required to make out an Eighth Amendment claim. *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

Finally, self-inflicted harm may constitute "serious harm" for purposes of the Eighth Amendment. *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012); *Sanville*, 266 F.3d at 733 ("It goes without saying that 'suicide is a serious harm.'"). A prison official can be held liable under the Eighth Amendment for self-inflicted harm committed by a prisoner if the official "subjectively knew" the prisoner was at "substantial risk" of self-harm or suicide, but intentionally disregarded that risk. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). To prevail on such a claim, however, the plaintiff must show that the defendant prison official "knew of a significant likelihood that the inmate would imminently attempt" self-harm or suicide, then "failed to take reasonable steps to prevent it." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018). Further, a "risk of future [self-harm] must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for ignoring that risk." *Id.* (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality op.) (emphasis omitted); *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)).

### A.     Absence of Risk of Serious Harm

Defendant argues that plaintiff's Eighth Amendment claim fails as a matter of law because there is no evidence that he sustained an actionable injury. (Dkt. #54, at 4-6.) Although plaintiff represents in response to defendant's summary judgment motion that he cut his left arm and wrist multiple times over the course of several hours on September 3, 2021, there is no record showing that he ever requested medical care for those wounds or reported them to HSU staff. If anything, the existing medical records *contradict* plaintiff's claim. Specifically, when plaintiff was treated by a nurse for a minor, self-

13

inflicted laceration to his left wrist just over a week later on September 11, 2021, she saw no other injuries. (Dkt. #49-1.) As importantly, defendant presents evidence that plaintiff has a history of threatening self-harm for secondary gain to get his needs met and, on the day in question, he was frustrated with HSU for not providing him with ibuprofen during the morning medication pass. (Strange Decl. (dkt. #51) ¶¶ 22-24; Dkt. #51-1; Ex. 1005 at 01:20 – 07:02.) Indeed, other than his own description, plaintiff also offers *no* evidence to substantiate his claim that he inflicted multiple wounds on his left arm and wrist on September 3, 2021. Even plaintiff's explanation -- that all of those wounds had healed by the time he was seen on September 11 -- serves only to show that any wounds he may have inflicted upon himself on September 3 were superficial and not serious, which is indicative of an insincere threat to get attention or to manipulate others. *See Lord v. Beahm*, 952 F.3d 902, 904-05 (7th Cir. 2020).

Because there is no evidence showing plaintiff actually suffered serious, physical harm, or even a substantial risk of his doing so by self-harm, he cannot recover damages stemming from the events of September 3, 2021. *See Farmer*, 511 U.S. at 834 (under the objective element of an Eighth Amendment claim for deliberate indifference, "the deprivation alleged must be, objectively, 'sufficiently serious'") (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)); *see also Lord*, 952 F.3d at 905 (The risk posed by officers ignoring a threat of suicide "is not compensable without evidence of injury[.]"); *Turner v. Boughton*, No. 19-cv-1001-jdp, 2023 WL 4930102, at *6-7 (W.D. Wis. Aug. 2, 2023) (granting summary judgment on claims that an officer disregarded a risk of suicide because

plaintiff failed to show he was harmed).  As a result, defendant is entitled to summary judgment on this issue and plaintiff's motion for summary judgment must be denied.

### B.    Deliberate Indifference

Defendant also argues that plaintiff cannot prevail because he has no evidence from which a reasonable jury could find that she was deliberately indifferent to a substantial risk of plaintiff causing harm to his own health and safety under the separate, subjective element of an Eighth Amendment claim.  (Dkt. #54, at 8-11.)  To the contrary, video recordings of defendant's interactions with plaintiff on the morning of September 3, 2021, reflect that plaintiff was:  upset when his ibuprofen was missing from the medication cart; frustrated with HSU staff; and in possession of a paperclip.  (Ex. 1005 at 01:20 – 07:02.)  Further, there is no dispute that defendant twice asked plaintiff to give her the paperclip, but he declined to do so, while assuring defendant that he would be okay.  (*Id*. at 07:40 – 08:17.)  When defendant later encountered him while picking up breakfast trays, and was again shown the paperclip, plaintiff similarly refused her request to surrender the item, expressing frustration with HSU, but voicing *no* threat of self-harm with the paperclip or otherwise.  (Ex. 1008 at 00:00 – 02:25.)

As importantly, *plaintiff* admits that he did not make any self-harming or suicidal statements to defendant during the morning medication pass *or* while she was collecting breakfast trays.  (Dkt. #60, at 4.)  Further, defendant has no recollection of plaintiff expressing an intention to self-harm during her shift on September 3, *and* is confident that she would have reported it to Sergeant Price if he had.  (Steingraeber Decl. (dkt. #48) ¶¶

15

37-38.)  There were also several other officers working on plaintiff's unit that morning, yet there are no entries in the log book by defendant or any other officer documenting an incident of actual self-harm or even a threat of self-harm by plaintiff on that day.  (Dkt. #48-1.)

Even assuming that a jury might credit plaintiff's version of the events, and he had loudly stated that he was "having thoughts of cutting himself" while defendant was engaged in other tasks at 11:15 a.m. and 11:20 a.m. (Sierra-Lopez Decl. (dkt. #41) ¶ 43), the mere mention of "suicidal thoughts" or thoughts of self-harm is *not* enough to put a reasonable officer on notice of a *substantial* risk of imminent, serious harm without a more concrete threat or at least a credible, specific threat of self-harm.  *Collins*, 462 F.3d at 761.  Rather, an officer is entitled to exercise reasonable discretion in assessing such a risk.  *Id*.

Here, there are ample records provided by Dr. Strange documenting plaintiff's tendency to threaten self-harm for secondary gain.  (Strange Decl. (dkt. #51) ¶¶ 22-24; Dkt. #51-1.)  Moreover, even if plaintiff had expressed specific intentions of committing self-harm, he still cannot establish liability under the Eighth Amendment because the record refutes plaintiff's claim that he sustained a serious injury on September 3, 2021, as discussed previously,  much less that he was at a substantial risk of serious harm that day.  As a result, there is no evidence from which a reasonable jury could conclude that defendant is liable for disregarding a risk of serious harm to plaintiff on September 3, 2021.  *See Farmer*, 511 U.S. at 834 (plaintiff must show defendant deliberately disregarded a "substantial risk of serious harm").  For this additional reason, defendant is entitled to summary judgment in her favor.

16

## III.    Qualified Immunity

Finally, defendant has asserted an alternative, legal defense of qualified immunity, which protects government officials from liability for damages unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense is raised, a plaintiff bears the burden of defeating it by showing that:  (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Garcia v. Posewitz*, 79 F.4th 874, 778 (7th Cir. 2023).  "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (citation and internal quotation marks omitted).

At minimum, plaintiff here has *not* shown that defendant *clearly* violated his constitutional rights by deliberately ignoring an objectively serious threat to his health and safety, nor that his misconduct resulted in actionable harm.  Because defendant is entitled to qualified immunity, the court will grant her motion for summary judgment for this additional reason as well.


ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by plaintiff David E. Sierra-Lopez (dkt. #38) is DENIED.

2. The motion for summary judgment filed by defendant Brook Steingraeber (dkt. #44) is GRANTED.

3. Plaintiff's motions for a status report (dkt. #67, #68) are DENIED as moot.

4. The clerk of court is DIRECTED to close this case.

Entered this 24th day of June, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge